Citation Nr: 1214070 
Decision Date: 04/17/12 Archive Date: 04/27/12

DOCKET NO. 99-15 778A ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Nashville, Tennessee


THE ISSUES

1. Entitlement to a total disability rating based on individual unemployability (TDIU).

2. Entitlement to an initial rating higher than 20 percent for degenerative joint disease (DJD) of the right knee.

3. Entitlement to an initial compensable disability rating for peripheral neuropathy of the left lower extremity.

4. Entitlement to an initial compensable disability rating for peripheral neuropathy of the right lower extremity.

5. Entitlement to service connection for peripheral neuropathy of the left upper extremity, including due to herbicide exposure; or alternatively, including as secondary to the service-connected Type II Diabetes Mellitus.

6. Entitlement to service connection for peripheral neuropathy of the right upper extremity, including due to herbicide exposure; or alternatively, including as secondary to the service-connected Type II Diabetes Mellitus.

7. Entitlement to service connection for hypertension, including due to herbicide exposure; or alternatively, including as secondary to the service-connected right knee DJD and/or Type II Diabetes Mellitus.

8. Entitlement to service connection for a chronic heart disability (excluding hypertension), including due to herbicide exposure; or alternatively, including as secondary to the service-connected Type II Diabetes Mellitus.

9. Entitlement to service connection for rash of the face and scalp, including due to herbicide exposure; or alternatively, including as secondary to the service-connected Type II Diabetes Mellitus.

10. Entitlement to service connection for gastroesophageal reflux disease (GERD), including due to herbicide exposure; or alternatively, including as secondary to the service-connected Type II Diabetes Mellitus.

11. Entitlement to service connection for erectile dysfunction (ED), including due to herbicide exposure; or alternatively, including as secondary to the service-connected Type II Diabetes Mellitus.

12. Entitlement to service connection for renal insufficiency (claimed as bladder condition), including due to herbicide exposure; or alternatively, including as secondary to the service-connected Type II Diabetes Mellitus.

13. Entitlement to service connection for a sinus disability, including due to herbicide exposure; or alternatively, including as secondary to the service-connected Type II Diabetes Mellitus.



REPRESENTATION

Appellant represented by: Sandra E. Booth, Attorney-at-law


ATTORNEY FOR THE BOARD

Biswajit Chatterjee, Counsel


INTRODUCTION

The Veteran served on active duty in the military from March 1968 to March 1970, including confirmed service from August 1968 to August 1969, during the Vietnam Era, in the Republic of Vietnam.

This appeal to the Board of Veterans' Appeals (Board) is from rating decisions of the Department of Veterans Affairs (VA) Regional Office (RO) in Nashville, Tennessee. 

Notably, an April 1999 rating decision granted the Veteran's claim for service connection for right knee DJD and assigned an initial 20 percent rating, retroactively effective from November 9, 1998. The Veteran appealed for a higher initial rating. See Fenderson v. West, 12 Vet. App. 119, 125-26 (1999) (when a Veteran appeals his initial rating, VA must consider whether he is entitled to a "staged" rating to compensate him for times since the effective date of his award when his disability may have been more severe than at others). In December 2000, the Board denied the claim for a higher initial rating for the right knee disability. The Veteran appealed the Board's decision to the United States Court of Appeals for Veterans Claims (CAVC/Court). In an August 2001 Order, granting a joint motion for remand, the CAVC vacated the Board's decision and remanded this case to the Board for further development and readjudication in compliance with directives specified in the June 2001 joint motion. In May 2002, the Board again denied the claim, followed by another CAVC vacatur and remand of the case to the Board, as per a March 2003 joint motion for remand. The Board, in August 2003, then remanded the right knee disability matter to the AOJ for a new VA examination. In September 2004, the Board again denied the claim, followed by another CAVC vacatur and remand of the case to the Board, as per a May 2006 joint motion for remand. The Board's December 2006 decision again denied the claim, followed by another CAVC vacatur and remand of the case to the Board, as per a February 2008 joint motion for remand. 

The Board most recently remanded the claim for an initial rating higher than 20 percent for right knee degenerative joint disease in July 2008, for a new VA examination to reassess the severity of his right knee disability. In October 2011, the AMC issued a supplemental statement of the case (SSOC) continuing to deny the right knee claim and returned the file to the Board for further appellate review. 

Also, a May 2004 rating decision denied a service-connection claim for hypertension, which the Veteran ultimately perfected for appeal to the Board. 

More recently, a September 2009 rating decision granted the Veteran's claim for service connection for peripheral neuropathy of the left and right lower extremities, and assigned an initial 0 percent rating for each, retroactively effective from May 11, 2009. The Veteran appealed for a higher initial rating. See Fenderson, 12 Vet. App. at 125-26. The September 2009 rating decision also denied the Veteran's service-connection claims for peripheral neuropathy of the bilateral upper extremities, a rash on the face and scalp, GERD, ED, renal insufficiency, a sinus disability, heart disability, and TDIU. 

Although the Veteran did not perfect an appeal of the TDIU denial, the Veteran's prior contentions and the record raises a continuing claim for entitlement to total disability based on individual unemployability. See Rice v. Shinseki, 22 Vet. App. 447 (2009). Indeed, it appears that the Veteran's overall disability picture has changed since the RO's September 2009 denial of the claim for a TDIU, e.g., in light of an initial rating assignment of 30 percent for PTSD and increased combined disability rating to 60 percent. Moreover, the Board is awarding compensable, separate ratings for his peripheral neuropathy of the lower extremities. As such, the Board assumes jurisdiction of the TDIU claim and addresses it below.

A June 2011 RO rating decision continued to deny the Veteran's service-connection claim for ischemic heart disease; and to ensure the Veteran the broadest consideration for his claim, the Board recharacterizes the service-connection issue on appeal for a heart disability to necessarily include the possibility of service connection for ischemic heart disease. See Brokowski v. Shinseki, 23 Vet. App. 79 (2009).

The Board notes that there are no ongoing appeals concerning the service-connected disabilities of diabetes and posttraumatic stress disorder (PTSD). In a March 2009 rating decision, the RO granted service connection for Type II Diabetes Mellitus, on a presumptive basis in association with herbicide exposure, and assigned a 20 percent initial rating, effective from November 26, 2008. As this determination constitutes a full grant of the benefits sought as to that claim, it is no longer in appellate status. See Grantham v. Brown, 114 F.3d. 1156 (Fed. Cir. 1997). This decision went unappealed.

In a May 2010 rating decision, the RO granted service connection for PTSD, and assigned a 30 percent rating, effective from November 12, 2009. The RO issued notice of this decision in letter dated on May 26, 2010. Although the Veteran subsequently submitted a notice of disagreement (NOD) with the assignment of the initial rating and earlier effective date, it was received by the RO on May 31, 2011, which was several days past the one-year appeals period. The RO sent the Veteran a letter in July 2011 that informed him that his attempt to appeal the May 2010 decision was untimely. He did not appeal this determination. 

Nonetheless, the issues of entitlement to an earlier effective date and an increased rating for PTSD beyond 30 percent have been raised by the record, but have not been adjudicated by the Agency of Original Jurisdiction (AOJ). Therefore, the Board does not have jurisdiction over them, and they are referred to the AOJ for appropriate action. 

The issues of entitlement to service connection for peripheral neuropathy of the bilateral upper extremities, hypertension, rash of the face and scalp, GERD, ED, renal insufficiency, sinus disability and TDIU are addressed in the REMAND portion of the decision below and are REMANDED to the RO.

FINDINGS OF FACT

1. There is no competent and credible evidence that right knee flexion is limited to 15 degrees or less or extension is limited beyond 3 degrees, even considering pain on motion due to arthritis. 

2. The competent and credible evidence does not show subluxation or lateral instability in the right knee.

3. Resolving any doubt in the Veteran's favor, his service-connected peripheral neuropathy of both the left and right lower extremities demonstrate mild incomplete paralysis of the sciatic nerve, for the entire period of appeal.

4. There is no competent and credible evidence the Veteran has had ischemic heart disease; that any chronic heart disability (excluding hypertension) had its onset in service or within one year of service discharge; that any current heart disability is related to his active military service, including to his presumed herbicide exposure in Vietnam; or was caused or aggravated by his service-connected Type II diabetes mellitus.


CONCLUSIONS OF LAW

1. The criteria are not met for an initial rating higher than 20 percent for right knee degenerative joint disease. 38 U.S.C.A. §§ 1155, 5103A (West 2002); 38 C.F.R. §§ 4.1-4.7, 4.10, 4.27, 4.40, 4.45, 4.59, 4.71a, Diagnostic Codes (DCs) 5003, 5010, 5257-5263 (2011). 

2. The criteria are met for a higher initial disability rating of 10 percent, but no greater, for peripheral neuropathy of the left lower extremity. 
38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2002 & Supp. 2011); 38 C.F.R. §§ 3.159, 3.321, 4.1-4.7, 4.124a, Diagnostic Code (DC) 8520 (2011).

3. The criteria are met for a higher initial disability rating of 10 percent, but no greater, for peripheral neuropathy of the right lower extremity. 
38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2002 & Supp. 2011); 38 C.F.R. §§ 3.159, 3.321, 4.1-4.7, 4.124a, Diagnostic Code (DC) 8520 (2011).

4. A chronic heart disability (excluding hypertension) was not incurred in or aggravated by the Veteran's military service, and may not be presumed to have been incurred in service, including from herbicide exposure in Vietnam; and is not secondary to his service-connected diabetes mellitus. 38 U.S.C.A. §§ 1101, 1110, 1112, 1113, 5103, 5103A (West 2002 and Supp. 2011); 38 C.F.R. §§ 3.159, 3.303, 3.307, 3.309, 3.310 (2011).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

I. VCAA

As provided by the Veterans Claims Assistance Act (VCAA), VA has duties to notify and assist a claimant in substantiating a claim for VA benefits. 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A, 5107, 5126 (West 2002 & Supp. 2011); 
38 C.F.R. §§ 3.102, 3.156(a), 3.159 and 3.326(a) (2011).

Proper notice from VA must inform the claimant of any information and medical or lay evidence not of record (1) that is necessary to substantiate the claim; (2) that VA will obtain and assist the claimant in obtaining; and (3) that the claimant is expected to provide. See 38 C.F.R. § 3.159(b)(1); see also Quartuccio v. Principi, 16 Vet. App. 183, 187 (2002). 

These VCAA notice requirements apply to all five elements of a service-connection claim: (1) Veteran status; (2) existence of a disability; (3) a connection between the Veteran's service and the disability; (4) degree of disability; and (5) effective date of the disability. See Dingess/Hartman v. Nicholson, 19 Vet. App. 473 (2006), aff'd sub nom. Hartman v. Nicholson, 483 F.3d 1311 (2007). Further, this notice must include information that a downstream disability rating and an effective date for the award of benefits will be assigned if service connection is granted. Id., at 486.

Ideally, VCAA notice should be provided prior to an initial unfavorable decision on a claim by the RO. Pelegrini v. Principi, 18 Vet. App. 112 (2004) (Pelegrini II). If, however, for whatever reason it was not, or the notice provided was inadequate, this timing error can be effectively "cured" by providing any necessary VCAA notice and then going back and readjudicating the claim - such as in a statement of the case (SOC) or supplemental SOC (SSOC), such that the intended purpose of the notice is not frustrated and the Veteran is given an opportunity to participate effectively in the adjudication of the claim. See Mayfield v. Nicholson, 499 F.3d 1317, 1323 (Fed. Cir. 2007) (Mayfield IV); Prickett v. Nicholson, 20 Vet. App. 370, 376 (2006).

In this case, letters satisfying the notice requirements of 38 C.F.R. § 3.159(b)(1) were sent to the Veteran in January and June 2009, prior to the initial decision on the claims for heart disability and peripheral neuropathy of the lower extremities in September 2009, so in the preferred sequence. Similarly, a letter compliant with § 3.159(b)(1) was sent again in December 2010, prior to the June 2011 rating decision on the heart disability, so also in the preferred sequence. However, a letter compliant with § 3.159(b)(1) was not sent for the right knee until December 2003, after the initial rating decision on the claim in April 1999, although that decision was made prior to the enactment of the VCAA (during the well-grounded claims era). The December 2003, January and June 2009 and December 2010 letters informed him of the evidence required to substantiate his claims and of his and VA's respective responsibilities in obtaining this supporting evidence; and also complied with Dingess. Since providing this additional Dingess notice, the AOJ has readjudicated the claims in the October 2011 SSOC, including considering the additional evidence received in response to this additional notice. So the timing defect in the provision of this additional notice, since it did not precede the initial adjudication of the claim, has been rectified ("cured"). See again Mayfield IV and Prickett, supra. He has not made any pleading or allegation of insufficient VCAA notice or shown that any such error is unduly prejudicial, meaning outcome determinative of his claim. As the pleading party, he, not VA, has this burden of proof. See Shinseki v. Sanders, 129 S. Ct. 1696 (2009). There is no such pleading or allegation in this instance.

VA also fulfilled its duty to assist the Veteran by obtaining all relevant evidence in support of his claims, which is obtainable, and therefore appellate review may proceed without prejudicing him. 38 U.S.C.A. § 5103A; 38 C.F.R. § 3.159; see also Bernard v. Brown, 4 Vet. App. 384 (1993). A review of the claims file shows that VA has conducted reasonable efforts to assist him in obtaining evidence necessary to substantiate his claims during the course of this appeal. The RO has obtained service treatment records (STRs), service personnel records (SPRs) and VA treatment records. The Veteran also submitted additional records and written statements in support of his claims. Neither the Veteran nor his representative has identified, and the record does not otherwise indicate, any additional existing evidence that is necessary for a fair adjudication of the claims that has not been obtained. 

Next, specific VA medical opinions pertinent to the issues on appeal were obtained in July 2009 and February 2010 to assess and reassess the severity of his peripheral neuropathy of the lower extremities, with March 2010 addendum opinion. VA examinations were similarly provided to assess and reassess the right knee disability in February 1999, January 2004, October 2008, April 2010 and September 2011. To that end, when VA undertakes to provide a VA examination or obtain a VA opinion, it must ensure that the examination or opinion is adequate. Barr v. Nicholson, 21 Vet. App. 303, 312 (2007). Altogether, the Board finds the above VA examination reports to be thorough and adequate upon which to base a decision with regard to the Veteran's claims. The VA examiners personally interviewed and examined the Veteran, including eliciting a history from the Veteran, and provided the information necessary to evaluate the disability under the applicable rating criteria. See 38 C.F.R. § 3.327(a) (2011); Caffrey v. Brown, 6 Vet. App. 377 (1994). Therefore, the available records and medical evidence have been obtained in order to make adequate determinations as to these claims.

The Board notes that the Veteran's last peripheral nerves examination is nearly two (2) years old and the last right knee disability examination is approximately one-half (1/2) year old. The mere passage of time since these examinations is not reason enough, alone, to require reexamination. See Palczewski v. Nicholson, 21 Vet. App. 174 (2007). Here, there is no objective evidence indicating that there has been a material change in the severity of the disabilities since the last respective examinations. The Veteran has not argued the contrary. 

Moreover, the Board last remanded this claim in July 2008 to have the Veteran's right knee disability reexamined to reassess its severity, and the AMC arranged examinations in October 2008, April 2010, and September 2011. Indeed, the most recent examination in September 2011 provided sufficient findings for evaluation under the rating criteria for knee disabilities. The examiner attempted to address any range-of-motion loss specifically due to pain on use on both active and passive motion, as required by DeLuca v. Brown, 8 Vet. App. 202 (1995), although concluding this could not be determined with any degree of medical certainty. The Board finds this statement sufficient, especially in light of the fact that the Veteran demonstrated a nearly normal range of motion and that the assignment of a higher rating would necessitate a significant loss of range of motion. See also Voerth v. West, 13 Vet. App. 117, 122-23 (1999) (holding that a condition that became inflamed approximately twice a year for a few days did not require examination during flare-up). Moreover, as requested in the remand, the examiner did specifically find that there was no atrophy of the right leg quadriceps compared to the left leg. So there was compliance with this remand directive. See D'Aries v. Peake, 22 Vet. App. 97, 105 (2008); Dyment v. West, 13 Vet. App. 141, 146-47 (1999) (holding that there was no Stegall v. West, 11 Vet. App. 268, 271 (1998), violation when the examiner made the ultimate determination required by the Board's remand). Therefore, the Board finds that VA has complied with the duty-to-assist requirements. 38 U.S.C.A. § 5103A. 

The Veteran was also afforded a VA examination in July 2009, with respect to the claim for service connection for a heart disability. This examination found that, even acknowledging the Veteran's history of an irregular heartbeat, the Veteran does not presently have any diagnosable chronic heart disability, specifically noting there is no evidence of ischemic coronary artery disease. 

The Veteran was not provided with a medical nexus opinion on direct or secondary service connection for a chronic heart disability because the standards of the Court's decision in McLendon v. Nicholson, 20 Vet. App. 79 (2006), have not been met. See also 38 U.S.C.A. § 5103A(d)(2); 38 C.F.R. § 3.159(c)(4). There is no competent evidence of in-service incurrence of a chronic heart disability. The service treatment records are unremarkable for complaints, treatment or diagnosis of any heart disorder during service. There is also no competent and credible evidence indicating his non-existent heart disability is etiologically linked to his service, including as due the presumed herbicide exposure. Importantly, a heart condition is not readily amenable to lay diagnosis or comment on etiology, in contrast with other conditions within the realm of lay observation and experience (e.g., a separated shoulder or broken arm, varicose veins, tinnitus (ringing in the ears), or pes planus (flat feet), etc.). See Colantonio v. Shinseki, No. 2009-7067 (Fed. Cir. Jun. 1, 2010), citing Waters v. Shinseki, 601 F.3d 1274 (Fed. Cir. 2010) (medically competent evidence is not required in every case to "indicate" that the claimant's disability "may be associated" with his service). The Board is not obligated to request an opinion when there is not this suggestion of a relevant disease or injury in service that could be associated with the currently claimed disabilities. Charles v. Principi, 16 Vet. App. 370 (2002).

Consequently, there is no reasonable possibility of substantiating the heart claim on a direct or presumptive basis; as such, another VA medical opinion is not warranted. Accordingly, the Board finds that VA's duty to assist with respect to obtaining a VA examination or opinion with respect to this issue on appeal has been met. 38 C.F.R. § 3.159(c)(4) . 


The Board concludes that all the available records and medical evidence has been obtained in order to make an adequate determination as to these claims. Hence, no further notice or assistance is required to fulfill VA's duty to assist in the development of the claims. Smith v. Gober, 14 Vet. App. 227 (2000), aff'd, 281 F.3d 1384 (Fed. Cir. 2002); Dela Cruz v. Principi, 15 Vet. App. 143 (2001); see also Quartuccio v. Principi, 16 Vet. App. 183 (2002). Therefore, the Board finds that VA has complied with the duty-to-assist requirements. 38 U.S.C.A. § 5103A.

II. Analysis-Higher Initial Ratings

In Fenderson v. West, 12 Vet. App. 119, 125-126 (1999), the Court noted the distinction between a new claim for an increased evaluation of a service-connected disability and a case, as here, in which the Veteran expresses dissatisfaction with the assignment of an initial disability evaluation where the disability in question has just been service connected. In the former situation, the Court held in Francisco v. Brown, 7 Vet. App. 55, 58 (1994), that the current level of disability is of primary importance. In the Fenderson scenario, however, where, as here, the Veteran has expressed dissatisfaction with the assignment of an initial rating, VA must assess the level of disability from the date of initial application for service connection and determine whether the level of disability warrants the assignment of different disability ratings at different times over the life of the claim-a practice known as "staged rating." Fenderson, 12 Vet. App. 125-126. 

A Veteran's entire history is reviewed when making a disability determination, but past medical reports do not have precedence over current medical findings. 38 C.F.R. § 4.1. 

Disability ratings are determined by applying the criteria set forth in VA's Schedule for Rating Disabilities (Rating Schedule). Ratings are based on the average impairment of earning capacity. Individual disabilities are assigned separate diagnostic codes. See 38 U.S.C.A. § 1155; 38 C.F.R. § 4.1. Where there is a question as to which of two evaluations shall be applied, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria required for that rating. Otherwise, the lower rating will be assigned. See 38 C.F.R. § 4.7. After careful consideration of the evidence, any reasonable doubt remaining is resolved in the Veteran's favor. 38 C.F.R. § 4.3.

Right Knee Disability

The Veteran contends the severity of his right knee disability warrants a higher initial rating. The Veteran's right knee degenerative joint disease is currently rated at 20 percent, effective from November 9, 1998, assigned analogously under 38 C.F.R. § 4.71a (diseases of the musculoskeletal system), DCs 5010-5260. 

DC 5010 provides that traumatic arthritis, when substantiated by X-ray findings, is to be evaluated under DC 5003 as degenerative or osteoarthritis, which in turn indicates the disability will be rated on the basis of limitation of motion under the appropriate Diagnostic Codes for the specific joint or joints involved - which, here, are DC 5260 for limitation of flexion and DC 5261 for limitation of extension. See 38 C.F.R. § 4.71a, DCs 5003, 5010. 

According to DC 5003, when the limitation of motion of the specific joint or joints involved is noncompensable (i.e., 0 percent) under the appropriate diagnostic codes, a rating of 10 percent is for application for each such major joint or group of minor joints affected by limitation of motion to be combined, not added, under DC 5003. Limitation of motion must be objectively confirmed by findings such as swelling, muscle spasm or satisfactory evidence of painful motion. Moreover, under DC 5003, in the absence of limitation of motion, a 10 percent rating is warranted where there is X-ray evidence of involvement of 2 or more major joints or 2 or more minor joint groups. A higher 20 percent rating requires X-ray evidence of involvement of 2 or more major joints or 2 or more minor joint groups, with occasional incapacitating exacerbations. For purposes of rating disability from arthritis, the knee is considered a major joint. 38 C.F.R. § 4.45(f). 

DC 5260 provides that flexion limited to 15 degrees warrants a 30 percent rating; flexion limited to 30 degrees warrants a 20 percent rating; flexion limited to 45 degrees warrants a 10 percent rating; and flexion limited to 60 degrees warrants a 0 percent (noncompensable) rating.

DC 5261 provides that extension limited to 45 degrees warrants a 50 percent rating; extension limited to 30 degrees warrants a 40 percent rating; extension limited to 20 degrees warrants a 30 percent rating; extension limited to 15 degrees warrants a 20 percent rating; extension limited to 10 degrees warrants a 10 percent rating; extension limited to 5 degrees warrants a 0 percent (noncompensable) rating.

Normal range of motion of the knee is from 0 degrees of extension to 140 degrees of flexion. See 38 C.F.R. § 4.71, Plate II. 

Under DC 5257, "other" knee impairment - including recurrent subluxation or lateral instability, warrants a 10 percent rating if resulting in slight disability, a 20 percent rating for moderate disability, and a 30 percent rating if it is severe.

The provisions of 38 C.F.R. §§ 4.40, 4.45, and 4.59 must be considered in assigning an evaluation for degenerative or traumatic arthritis under DC 5003 or 5010. Rating personnel must consider functional loss and clearly explain the impact of pain on the disability. When an evaluation of a disability is based on limitation of motion, the Board must also consider, in conjunction with the otherwise applicable diagnostic code, any additional functional loss the Veteran may have by virtue of other factors as described in 38 C.F.R. §§ 4.40 and 4.45. DeLuca v. Brown, 8 Vet. App. 202, 206 (1995). These factors include more or less movement than normal, weakened movement, premature or excess fatigability, incoordination, pain on movement, swelling, and deformity or atrophy of disuse. The provisions of 38 C.F.R. § 4.40 state that disability of the musculoskeletal system is primarily the inability, due to damage or inflammation in parts of the system, to perform normal working movements of the body with normal excursion, strength, speed, coordination and endurance. A finding of functional loss due to pain must be supported by adequate pathology and evidenced by the visible behavior of the claimant. 38 C.F.R. § 4.40; Johnston v. Brown, 10 Vet. App. 80, 85 (1997). 



VA's General Counsel has held that a claimant who has arthritis and instability of the knee may be rated separately under DCs 5003 and 5257. 
VAOPGCPREC 23-97; 62 Fed. Reg. 63,604 (July 1, 1997; revised July 24, 1997). The General Counsel subsequently clarified in VAOPGCPREC 9-98 (August 14, 1998) that, for a knee disability rated under DC 5257 to warrant a separate rating for arthritis based on X-ray findings and limitation of motion, limitation of motion under DC 5260 or 5261 need not be compensable but must at least meet the criteria for a zero-percent rating. VA's General Counsel further explained that, if a Veteran has a disability rating under DC 5257 for instability of the knee, a separate rating for arthritis could also be based on X-ray findings and painful motion under 38 C.F.R. § 4.59. This is because, read together, DC 5003 and 38 C.F.R. § 4.59 provide that painful motion due to degenerative arthritis, which is established by X-ray, is deemed to be limitation of motion and warrants the minimum rating for a joint, even if there is no actual limitation of motion. Lichtenfels v. Derwinski, 1 Vet. App. 484, 488 (1991).

VA's General Counsel has additionally held that separate ratings may be assigned, as well, for limitation of knee extension and flexion. VAOPGCPREC 9-2004; 
69 Fed. Reg. 59,990 (2004). Specifically, where a Veteran has both a compensable level of limitation of flexion and a compensable level of limitation of extension of the same knee, the limitations must be rated separately to adequately compensate him for functional loss associated with injury to his leg and knee. Id.

Several diagnostic codes for knee impairment are not applicable to this instant case, because they do not provide ratings higher than 20 percent, including DC 5258 (cartilage, semilunar, dislocated), DC 5259 (cartilage, semilunar, removal of, symptomatic), and DC 5263 (genu recurvatum).

The competent evidence does not show the Veteran has the type of impairment contemplated by still other codes for rating the knees. In that regard, DC 5256 (ankylosis of the knee) and DC 5262 (impairment of the tibia and fibula) are not applicable in this case. See Butts v. Brown, 5 Vet. App. 532 (1993) (choice of diagnostic code should be upheld if it is supported by explanation and evidence). See also Pernorio v. Derwinski, 2 Vet. App. 625, 629 (1992) (indicating that any change in DC must be specifically explained). For instance, although the Veteran's disability was initially rated by the RO using DC 5262, there is simply no competent evidence that the Veteran has actually had any impairment of the tibia and fibula (i.e., malunion or nonunion).

Also, the mere fact that the Veteran continues to have range of motion in his right knee, even if less than normal range of motion, means that, by definition, his right knee is not ankylosed and DC 5256 is inapplicable. Ankylosis is the complete immobility and consolidation of the joint due to disease, injury or surgical procedure. See Dinsay v. Brown, 9 Vet. App. 79, 81 (1996) and Lewis v. Derwinski, 3 Vet. App. 259 (1992) [citing Saunders Encyclopedia and Dictionary of Medicine, Nursing, and Allied Health at 68 (4th ed. 1987)]. 

During the pertinent period of the appeal, the competent and credible medical and lay evidence of record does not demonstrate a rating higher than 20 percent under the applicable rating criteria for limitation of flexion (DC 5260), or even separate compensable ratings for extension (DC 5261) and instability/subluxation (DC 5257). His VA examination reports provide the most probative evidence pertinent to this claim. During the entire appeal, the competent and credible medical and lay evidence of record does not demonstrate a higher initial rating is warranted.

On range-of-motion testing for the right knee, the Veteran showed right knee active flexion limited to 130 degrees (February 1999 VA examination), 120 degrees (January 2004 VA examination), 140 degrees (October 2008), 140 degrees (April 2010) and 130 degrees (September 2011), generally with indications of pain on active motion. Although the October 2008 VA examiner found extension limited to 3 degrees, without pain on motion, the other examiners (February 1999, January 2004, April 2010 and September 2011) all found full active extension to 0 degrees, even with indications of pain on active motion. 

In sum, the Veteran's right knee flexion is not so limited as to warrant the higher 30 percent disability rating under DC 5260, even considering reports of arthritic pain on motion. The worst finding by the VA examiners showed flexion limited to 120 degrees on repetitive motion, considering objective evidence of pain on motion. See 38 C.F.R. § 4.40, 4.45, 4.59; DeLuca v. Brown. This does not remotely approach the necessary limitation of flexion to 15 degrees or less, as required for a higher 30 percent disability rating for the right knee.

Considering the extent of the pain associated with his arthritis, the Veteran did not have any resultant limitation of extension. The Veteran had nearly full extension, to no more than 3 degrees loss of range of motion considering his pain. This certainly does not warrant a compensable rating (10 percent) under DC 5261, which requires actual extension restricted to at least 10 degrees.

The Board further finds that there is no basis for the assignment of a higher rating based on consideration of any of the factors addressed in 38 C.F.R. §§ 4.40, 4.45 and DeLuca, 8 Vet. App. at 204-7. The Court has recently held, however, that "pain itself does not rise to the level of functional loss as contemplated by VA regulations applicable to the musculoskeletal system." Mitchell v. Shinseki, 25 Vet. App. 32, 38 (2011). Rather, pain, may result in functional loss, but only if it limits the ability "to perform the normal working movements of the body with normal excursion, strength, speed, coordination, or endurance." Id., quoting 38 C.F.R. § 4.40. Indeed, as noted, even with his complaints of pain, the Veteran had no loss of extension (functional loss). Evidence reflects that the currently assigned 20 percent rating properly compensates him for the extent of functional loss resulting from symptoms like painful motion, tenderness, and popping and locking. 

Moreover, as requested in the July 2008 Board remand, the September 2011 examiner specifically found that there was no atrophy of the right leg quadriceps compared to the left leg, precluding another basis for functional loss. 

The Board is fully cognizant that the Veteran has consistently reported pain associated with his service-connected right knee disability. The Board has considered the factors regarding pain and functional loss noted above. Here, however, the weight of the evidence is against a finding that pain or limitation of motion on repetitive use results in functional loss warranting the assignment of any increased evaluation. The overall evidence of record does not reflect any findings of functional loss greater than that contemplated by the currently assigned 20 percent rating.

The Board acknowledges that several VA examiners were unable to test any additional limitation of motion due to pain on actual or repetitive motion, citing a lack of medical certainty. For instance, the September 2011 VA examiner concluded, "On today's examination, the patient did have some discomfort on active range of motion of his knee. It is conceivable that the pain could further limit function as described, particularly with repetitive use. It is not feasible, however, to attempt to express any of these in terms of additional limitation of motion, as these matters cannot be determined with any degree of medical certainty." The case of Mitchell is instructive, in its conclusion that a Veteran may not be awarded the maximum disability ratings for limitation of flexion (DC 5260) and extension (DC 5261) solely based on complaints of pain throughout the joint's range of motion. Mitchell, 25 Vet. App. at 43. There is no basis to award the Veteran the maximum ratings for limitation of flexion and extension, simply due to the complaints of pain on motion at examinations. Again, the Board emphasizes that the Veteran presented nearly full range of motion on examination, which is well shy of the criteria needed to a higher 30 percent rating for limitation of flexion or a separate compensable rating for limitation of extension. 

Read together, Diagnostic Code 5003 and 38 C.F.R. § 4.59 provide that painful motion due to degenerative arthritis, which is established by X-ray, is deemed to be limitation of motion and warrants the minimum rating for a joint, even if there is no actual limitation of motion. Lichtenfels v. Derwinski, 1 Vet. App. 484, 488 (1991). Here, the Veteran is already in receipt of a 20 percent rating for limited motion of his right knee, including as limited by painful motion due to arthritis. 

With regard to establishing loss of function due to pain, it is necessary that complaints be supported by adequate pathology and be evidenced by the visible behavior of the claimant. 38 C.F.R. § 4.40. The Board finds that the effects of pain, and DeLuca factors of functional loss, reasonably shown to be due to the Veteran's arthritis of the knee, are contemplated in the currently assigned 20 percent rating. There is no indication that his associated pain causes functional loss greater than that contemplated by the 20 percent evaluation now assigned. 38 C.F.R. § 4.40, 4.45, 4.59; DeLuca v. Brown. 

Moreover, although he has degenerative arthritis under DC 5003 with resulting limitation of flexion under DC 5260, the Veteran is not entitled to a separate rating for instability/subluxation under DC 5257. There are no clinical findings by the VA examiners suggesting the Veteran has either subluxation or lateral instability in the right knee to warrant application of DC 5257. Rather, the February 1999, January 2004, October 2008, April 2010 and September 2011 VA examiners all found the Veteran's right knee to be stable on testing. As discussed below, the Board finds his assertions of instability are not competent and credible. Thus, the Board finds that the preponderance of the evidence is against a finding of slight right knee instability.

In addition to the medical evidence, the Board has considered the Veteran's personal assertions in support of his claim. The Veteran is competent, as a layperson, to report on that as to which he has personal knowledge, such as the existence of pain, popping, locking and inability to walk long distances. See Jandreau v. Nicholson, 492 F.3d 1372, 1377 (Fed. Cir. 2007); Barr v. Nicholson, 21 Vet. App. 303, 310 (2007); and 38 C.F.R. § 3.159(a)(2). As a layperson, without the appropriate medical training and expertise, he is not competent to provide a probative (persuasive) opinion on a medical matter, especially the severity of his right knee disability in terms of the applicable rating criteria. Rather, this necessarily requires appropriate medical findings regarding the extent and nature of his right knee arthritis. 

The Board emphasizes that it is not obligated to accept these assertions of symptomatology as fact if they are found to not be credible. Caluza v. Brown, 7 Vet. App. 498 (1995). In that regard, the Board is not able to accept the Veteran's own complaints of functional limitation as factually accurate, given the assessment of the VA examiners that such complaints are inconsistent with the clinical observations. 

Overall, the Board finds the Veteran's lay statements in support of his claim are not credible, and therefore, not probative. Thus, evidence of increased right knee symptomatology has not been established, either through medical or lay evidence.

Since the Veteran's right knee disability has never been more than 20 percent disabling at any time since the effective date of service connection, the Board cannot "stage" this rating. Fenderson, 12 Vet. App at 125-26. 

As the preponderance of the evidence is against the Veteran's claim for an initial disability rating higher than 20 percent for his service-connected right knee disability, the "benefit-of-the-doubt" rule is not applicable, and the Board must deny the claim. See 38 U.S.C.A. § 5107(b); 38 C.F.R. § 4.3; Gilbert v. Derwinski, 1 Vet. App. 49 (1991).

Compensable Initial Ratings for Peripheral Neuropathy of 
Bilateral Lower Extremities

The Veteran's peripheral neuropathy of the left and right lower extremities are currently assigned separate noncompensable (i.e., 0 percent) initial ratings under 38 C.F.R. § 4.124a, DC 8520, effective from May 11, 2009, the date service-connection was established. See Butts v. Brown, 5 Vet. App. 532 (1993) (choice of diagnostic code should be upheld if it is supported by explanation and evidence). See also Pernorio v. Derwinski, 2 Vet. App. 625, 629 (1992) (indicating that any change in DC must be specifically explained).

Under DC 8520, pertaining to paralysis of the sciatic nerve, mild incomplete paralysis warrants a 10 percent disability rating, moderate incomplete paralysis warrants a 20 percent disability rating, moderately severe incomplete paralysis warrants a 40 percent disability rating, severe incomplete paralysis with marked muscular atrophy warrants a 60 percent disability rating; and complete paralysis warrants the maximum 80 percent rating. 38 C.F.R. § 4.124a, DC 8520 (2011).


Here, the evidence of record warrants compensable ratings for peripheral neuropathy of the lower extremities, for each side, throughout this latter period of the appeal. See 38 C.F.R. § 4.124a, DC 8520; see also 38 C.F.R. §§ 4.2, 4.3, 4.6, 4.7. 

At the Veteran's July 2009 VA diabetes examination, he reported a history of burning and itching in his feet from three (3) years prior, so dating back to approximately 2006. He specifically denied any loss of function with these symptoms. Neurologic testing showed in both lower extremities that he had strength of 5/5, sensation to light touch and vibration intact, normal gait, normal tandem walking, negative Romberg sign, normal finger-to-nose walking, but diminished sensation on the plantar aspect of the toes and MTP joints of each foot. 
The assessment of needle electromyography and nerve conduction studies (EMG-NCV) revealed a conclusion of abnormal findings. In particular, the examiner found electrophysiological evidence of a mild sensorimotor polyneuropathy. The examiner also remarked this is at least as likely as not secondary to his Type II, Diabetes Mellitus. 

At the Veteran's February 2010 VA peripheral nerves examination, he reported a history of bilateral foot numbness, on an episodic basis, for the prior three (3) years, so dating back to at least 2007. Commenting on electro diagnostic (EDX) test results, the examiner indicated his lower extremity numbness might be due to non-service-connected lumbosacral radiculopathies. However, the examiner went on to state that, "there is no way to exclude a mild polyneuropathy," and "clinically, the distribution of ten-toe and sole numbness is more consistent with a polyneuropathy." Also, in an addendum opinion, dated in March 2010, the examiner commented on subsequent EMG-NCV testing results, finding "possibly mild peripheral neuropathy in the lower extremities."

So, it appears that throughout the period of the appeal (i.e., dating back to May 2009), the Veteran has demonstrated bilateral lower extremity peripheral neuropathy. This provides evidence suggestive of "mild" incomplete paralysis of the sciatic nerve, which warrants compensable initial ratings of 10 percent for both lower extremities. 38 C.F.R. § 4.7. 

Absent neurological testing evidence indicating a moderate or even more severe level of peripheral neuropathy, there is simply no basis to award an even higher initial rating for either foot. In this regard, the VA examination findings consistently found only a "mild" level of neuropathy, but no worse.

The Board also emphasizes that in addition to the medical evidence, the Board has considered the Veteran's personal assertions in support of his claim. He is competent, as a layman, to report on that as to which he has personal knowledge, such as the existence of numbness, burning and itching of his feet. See Jandreau v. Nicholson, 492 F.3d 1372, 1377 (Fed. Cir. 2007); Barr v. Nicholson, 21 Vet. App. 303, 310 (2007); and 38 C.F.R. § 3.159(a)(2). Since his allegations of these particular symptoms appear to be uncontradicted, even by medical findings of record, the Board also finds them to be credible and, thus, probative. See Buchanan v. Nicholson, 451 F.3d 1331 (Fed. Cir. 2006). 

Nonetheless, the Board notes that the medical findings in this regard were even more probative, since they confirmed his subjective complaints. Resolving any doubt in the Veteran's favor, for this entire recent period of the appeal, the evidence supports separate 10-percent disability ratings, but no higher, for his respective left- and right-sided peripheral neuropathy of the lower extremities. See Mittleider v. West, 11 Vet. App. 181, 182 (1998) (citing 61 Fed. Reg. 52,698 (Oct. 8, 1996); 38 C.F.R. § 4.3.

In addition to the medical evidence, the Board has considered the Veteran's personal assertions in support of his claim, to the extent the Veteran would appeal for even higher ratings than 10 percent for each lower extremity. The Board acknowledges his competency to testify on matters of numbness, burning and itching in his feet. On the other hand, as a layman, without the appropriate medical training and expertise, he is not competent to provide a probative (persuasive) opinion on a medical matter, especially the severity of his disability in terms of the applicable rating criteria. Rather, this necessarily requires appropriate medical findings regarding the extent and nature of his peripheral neuropathy, which requires both specialized medical knowledge of neurology and testing of neurological manifestations, such as EMG-NCV testing.

Since the Veteran's peripheral neuropathy has never been more than 10 percent disabling for the left and right sides of his lower extremities at any time since the effective date of service connection, the Board cannot "stage" this rating. Fenderson, 12 Vet. App at 125-26. 

As the preponderance of the evidence is against the Veteran's claim for a disability rating higher than 10 percent, for either the left or right side of the lower extremities, since May 11, 2009 (date service connection established), the "benefit-of-the-doubt" rule is inapplicable, and the Board must deny the claim. See 38 U.S.C.A. § 5107(b); 38 C.F.R. § 4.3; Gilbert v. Derwinski, 1 Vet. App. 49 (1991).

Extra-Schedular Consideration

Next, the Board will consider whether referral for an extraschedular evaluation is warranted. The question of an extraschedular rating is a component of a claim for an increased rating. 38 C.F.R. § 3.321(b)(1); see Bagwell v. Brown, 9 Vet. App. 337, 339 (1996). Although the Board may not assign an extraschedular rating in the first instance, it must specifically adjudicate whether to refer a case for extraschedular evaluation when the issue either is raised by the claimant or is reasonably raised by the evidence of record. Barringer v. Peake, 22 Vet. App. 242 (2008).

The Court has clarified the analytical steps necessary to determine whether referral for such consideration is warranted. See Thun v. Peake, 22 Vet. App. 111 (2008). First, VA must first determine whether the available applicable schedular rating criteria are inadequate because they do not contemplate the Veteran's level of disability and symptomatology. If the rating criteria are inadequate, VA must then determine whether the Veteran exhibits an exceptional disability picture indicated by other related factors such as marked interference with employment or frequent periods of hospitalization. If such related factors are exhibited, then referral must be made to the Under Secretary for Benefits or the Director of the Compensation and Pension Service for extraschedular consideration.

In this case, the evidence does not indicate that Veteran's disability picture could not be adequately contemplated by the applicable schedular rating criteria discussed above. In this case, there has been no showing that the Veteran's disability picture could not be contemplated adequately by the applicable schedular rating criteria discussed above. The Veteran's peripheral neuropathy of the bilateral lower extremities was applied to the applicable rating criteria, which specifically contemplate numbness and other neurological manifestations of his extremities, as in the current case. Similarly, the right knee disability was applied to the applicable rating criteria, which contemplate the type of arthritic pain, locking and limitation of motion that are contemplated by the knee rating criteria. 

Although the diagnostic codes in this case allow for higher ratings, the Board fully explained why the higher ratings were not warranted. Therefore, given that the applicable schedular rating criteria are more than adequate in this case, the Board need not consider whether the Veteran's disability picture includes exceptional factors, and referral for consideration of the assignment of a disability evaluation on an extraschedular basis is not warranted. See Thun, 22 Vet. App. at 111; see also Bagwell v. Brown, 9 Vet. App. 337, 338-9 (1996); Floyd v. Brown, 9 Vet. App. 88, 96 (1996); Shipwash v. Brown, 8 Vet. App. 218, 227 (1995).

III. Analysis-Entitlement to Service Connection

The Veteran contends he developed a heart condition secondary to his service-connected Type II Diabetes Mellitus. Alternatively, he asserts his heart condition is a result of exposure to herbicides during his active duty military service in the Republic of Vietnam, during the Vietnam War.

Service connection may be granted for a disability resulting from disease or injury incurred in or aggravated by service. 38 U.S.C.A. §§ 1110, 1131; 38 C.F.R. 
§ 3.303(a). Service connection may also be granted for any disease diagnosed after discharge, when all of the evidence, including that pertinent to service, establishes that the disease was incurred in service. 38 C.F.R. § 3.303(d).

Direct service connection may not be granted without evidence of a current disability; in-service incurrence or aggravation of a disease or injury; and a nexus between the claimed in- service disease or injury and the present disease or injury. 38 U.S.C.A. § 1112; 38 C.F.R. § 3.304. See also Caluza v. Brown, 7 Vet. App. 498, 506 (1995) aff'd, 78 F.3d 604 (Fed. Cir. 1996) [(table)].

Alternatively, service connection may be established under 38 C.F.R. § 3.303(b) by (a) evidence of (i) the existence of a chronic disease in service or during an applicable presumption period under 38 C.F.R. § 3.307 and (ii) present manifestations of the same chronic disease, or (b) when a chronic disease is not present during service, evidence of continuity of symptomatology.

When there is an approximate balance of positive and negative evidence regarding any issue material to the determination of a matter, the Secretary shall give the benefit of the doubt to the claimant. 38 U.S.C.A. § 5107; 38 C.F.R. § 3.102; see also Gilbert v. Derwinski, 1 Vet. App. 49, 53 (1990).

Certain chronic diseases, including a cardiovascular-renal disease, may be service connected on a presumptive basis if manifested to a compensable degree within one year of active duty service. 38 U.S.C.A. §§ 1101, 1112, 1113; 38 C.F.R. §§ 3.307(a)(3); 3.309(a) (2011).

Applicable regulations provide that a Veteran who served on active duty in Vietnam during the Vietnam era is presumed to have been exposed to Agent Orange or similar herbicide. 38 C.F.R. § 3.307(a)(1)(6)(iii). Here, the Board finds the Veteran is presumed to have been exposed to herbicides, since his DD Form 214 confirms he served in the Republic of Vietnam during the Vietnam War. 38 C.F.R. § 3.307(a)(6)(iii).

Diseases associated with exposure to certain herbicide agents used in support of military operations in the Republic of Vietnam during the Vietnam era will be presumed to have been incurred in or aggravated by service. 38 U.S.C.A. § 1116(a)(1); 38 C.F.R. § 3.307(a)(6). The presumption requires exposure to an herbicide agent and manifestation of the disease to a degree of 10 percent or more within the time period specified for each disease. 38 C.F.R. § 3.307(a)(6)(ii).

On October 13, 2009, in accordance with authority provided in 38 U.S.C. § 1116, the Secretary of VA announced his decision to establish presumptions of service connection, based upon exposure to herbicides used in the Republic of Vietnam during the Vietnam era, for three new conditions: ischemic heart disease, Parkinson's disease, and B cell leukemias. On March 25, 2010, the Secretary published in the Federal Register a proposed rule that would amend 38 C.F.R. § 3.309(e) to establish a presumption of service connection for ischemic heart disease, Parkinson's disease, and B cell leukemias based upon exposure to herbicides used in the Republic of Vietnam during the Vietnam era. 75 Fed. Reg. 14,391. On August 31, 2010, the Secretary published in the Federal Register a final rule amending 38 C.F.R. § 3.309(e) to establish such presumptions. 75 Fed. Reg. 53,202. The final rule was effective August 31, 2010.

In the proposed rule, which was ultimately adopted, VA noted that, according to Harrison's Principles of Internal Medicine (Harrison's Online, Chapter 237, Ischemic Heart Disease, 2008), IHD [ischemic heart disease] is a condition in which there is an inadequate supply of blood and oxygen to a portion of the myocardium; it typically occurs when there is an imbalance between myocardial oxygen supply and demand. Therefore, for purposes of the regulation, the term ''IHD'' [ischemic heart disease] includes, but is not limited to, acute, subacute, and old myocardial infarction; atherosclerotic cardiovascular disease including coronary artery disease (including coronary spasm) and coronary bypass surgery; and stable, unstable and Prinzmetal's angina. Since the term refers only to heart disease, it does not include hypertension or peripheral manifestations of arteriosclerosis such as peripheral vascular disease or stroke. 75 Fed. Reg. 14,391, 14,393 (March 25, 2010). 

Effective August 31, 2010, 38 C.F.R. § 3.309(e) provides that presumptive service connection based on Agent Orange exposure is available for the following diseases: AL amyloidosis; chloracne or other acneform disease consistent with chloracne; type 2 diabetes (also known as Type II diabetes mellitus or adult-onset diabetes); Hodgkin's disease; ischemic heart disease (including, but not limited to, acute, subacute, and old myocardial infarction; atherosclerotic cardiovascular disease including coronary artery disease (including coronary spasm) and coronary bypass surgery; and stable, unstable and Prinzmetal's angina); all chronic B-cell leukemias (including, but not limited to, hairy-cell leukemia and chronic lymphocytic leukemia); multiple myeloma; non-Hodgkin's lymphoma- Parkinson's disease; acute and subacute peripheral neuropathy; porphyria cutanea tarda; prostate cancer; respiratory cancers (cancer of the lung, bronchus, larynx, or trachea); soft-tissue sarcoma (other than osteosarcoma, chondrosarcoma, Kaposi's sarcoma, or mesothelioma). 

However, for purposes of this section, the term "ischemic heart disease" does not include hypertension or peripheral manifestations of arteriosclerosis such as peripheral vascular disease or stroke, or any other condition that does not qualify within the generally accepted medical definition of ischemic heart disease. 38 C.F.R. § 3.309(e), Note 3 (effective August 31, 2010).

The Veteran's VA medical records simply do not show a current chronic heart disability, even though the examiner acknowledged history of an irregular heartbeat. The Veteran's non-existent heart disability is necessarily not on the list of diseases associated with herbicide exposure for purposes of the presumption. 38 U.S.C.A. § 1116(a)(2); 38 C.F.R. § 3.309(e). To emphasize, the Veteran does not have a diagnosis for ischemic heart disease or any related heart disability that might qualify for presumptive service connection. See 38 C.F.R. § 3.309(e). Further, as mentioned, the July 2009 VA examiner specifically declined to diagnose ischemic coronary artery disease. Moreover, there is no indication of any current heart condition in which there is an inadequate supply of blood and oxygen to a portion of the myocardium, as required for ischemic heart disease. See 75 Fed. Reg. 14,391, 14,393 (March 25, 2010). The criteria for presumptive service connection for ischemic heart disease on the basis of herbicide exposure have not been satisfied.

The Board turns to consideration of the possibility any heart disability is secondary to his service-connected diabetes. Service connection may be established on a secondary basis for disability that is proximately due to or the result of a service-connected condition. See 38 C.F.R. § 3.310(a). Secondary entitlement is also available when a service-connected condition has chronically - meaning permanently - aggravated the disability in question, but compensation is limited to the degree of disability (and only that degree) over and above the degree of disability existing prior to the aggravation. See 38 C.F.R. § 3.310(b); see also Allen v. Brown, 7 Vet. App. 439, 448 (1995) (en banc).

In the absence of any medical evidence confirming the Veteran has a current chronic heart disability, there is also no possibility of establishing such non-existent disability was ether caused and/or aggravated by his diabetes mellitus, Type II, not to mention any other service-connected disability. See 38 C.F.R. § 3.310(a) and (b); see also Allen v. Brown, 7 Vet. App. at 448. 

The Veteran is competent, even as a layman, to comment on any symptoms within his five senses, such as having experienced heart pain and an irregular heartbeat. See Jandreau v. Nicholson, 492 F.3d 1372, 1377 (Fed. Cir. 2007); Barr v. Nicholson, 21 Vet. App. 303, 310 (2007); and 38 C.F.R. § 3.159(a)(2). 

The Veteran is not competent, however, to ascribe these symptoms to a particular diagnosis for a chronic heart disability. Certain disabilities, including ischemic heart disease (which is not shown here), are medically complex in nature and simply not readily amenable to lay diagnosis or probative opinion on etiology. See Woehlaert v. Nicholson, 21 Vet. App. 456 (2007) (certain disabilities are not conditions capable of lay diagnosis). But see Davidson v. Shinseki, 581 F.3d 1313 (Fed. Cir. 2009) (clarifying that medical evidence is not always or categorically required in every instance to establish the required nexus or linkage between the claimed disability and service or a service-connected disability). The Board finds he is not competent to self-diagnose his heart disability, particularly with regards to identifying the existence of ischemic heart disease.

Regarding the claim for secondary service connection, medical evidence is usually, though not always, required to associate a claimed condition with a service-connected disability. See Wallin v. West, 11 Vet. App. 509, 512 (1998); Velez v. West, 11 Vet. App. 148, 158 (1998); and McQueen v. West, 13 Vet. App. 237 (1999). The Board finds medical evidence is needed to establish secondary service connection in the instant case, since the Veteran's heart disability is not the type of condition that is readily amenable to mere lay probative comment regarding its etiology, given its inherent medical complexity. See Davidson v. Shinseki, 581 F.3d 1313 (Fed. Cir. 2009); Jandreau v. Nicholson, 492 F.3d 1372, 1377 (Fed. Cir. 2007); and Woehlaert v. Nicholson, 21 Vet. App. 456, 462 (2007). There is no indication that the Veteran is competent to attribute his heart-related symptoms to any service-connected disability, either for the notion that this disability is causally related to or aggravated by his service-connected disabilities, especially including diabetes. These are inherently complex medical determinations that require specialized medical expertise. The Board finds his lay statements regarding secondary service connection for his current heart disability are not competent.

Since the Board does not find the Veteran's lay statements to be competent to establish the missing elements of his claim, there is no need to next consider the credibility of his lay statements in this regard. See Buchanan v. Nicholson, 451 F.3d 1331 (Fed. Cir. 2006) (addressing lay evidence as potentially competent to support presence of disability, including during service and since, even where not corroborated by contemporaneous medical evidence such as treatment records, but also indicating the Board retains the discretion to make credibility determinations and otherwise weigh the evidence submitted, including lay evidence). See also Rucker v. Brown, 10 Vet. App. 67 (1997) and Layno v. Brown, 6 Vet. App. 465, 469 (1994) (distinguishing between competency ("a legal concept determining whether testimony may be heard and considered") and credibility ("a factual determination going to the probative value of the evidence to be made after the evidence has been admitted")).

The Board therefore next turns to consideration of possible entitlement to service connection for the heart disability on a direct-incurrence basis, but finds the claim lacking in this respect as well.

There is no objective indication of in-service incurrence of any heart condition. 
His heart and vascular system were described as normal on both his in-service examination reports in August 1967 (pre-induction) and February 1970 separation examination. The Veteran's service treatment records are completely unremarkable for any complaint, treatment, or clinical diagnosis of a heart disorder during his active duty military service. He does not necessarily argue the contrary. The record also fails to show by objective evaluation that he manifested any cardiovascular disease to a degree of 10 percent by March 1971 (within the first year following his active duty service discharge, in March 1970), precluding presumptive service connection for chronic diseases. 

Although it is presumed that he was exposed to a toxic herbicide while in the Republic of Vietnam, there still has to be some competent and credible evidence that his current heart disability is attributable to that exposure. Here, there is no medical opinion evidence etiologically linking a non-existent current heart disability to his military service, including as due to his presumed exposure to herbicides. See Watson v. Brown, 4 Vet. App. 309, 314 (1993) ("A determination of service connection requires a finding of the existence of a current disability and a determination of a relationship between that disability and an injury or a disease incurred in service."). 

Since the Veteran has not proffered any lay statements in support of the notion of a theory of direct-service-incurrence, there is no need for the Board to further consider lay statements in that regard.

In light of the above discussion, the Board concludes that the preponderance of the evidence is against this claim and there is no doubt to be otherwise resolved. As such, the claim is denied.


ORDER

Entitlement to an initial rating higher than 20 percent for the right knee disability is denied.

A higher initial 10 percent rating is granted for the peripheral neuropathy of the left lower extremity, subject to the statutes and regulations governing the payment of VA compensation.

A higher initial 10 percent rating is granted for the peripheral neuropathy of the right lower extremity, subject to the statutes and regulations governing the payment of VA compensation.

Service connection for a heart disability, including as due to exposure to herbicides and as secondary to the service-connected Type II diabetes mellitus, is denied.


REMAND

VA Compensation Examination and Medical Opinion

The Veteran contends he developed hypertension, peripheral neuropathy of the upper extremities, rash of the face and scalp, GERD, ED, renal insufficiency, and a sinus disability, as a result of exposure to herbicides during his active duty military, or alternatively, on a secondary basis to service-connected Type II, Diabetes Mellitus. The Board finds it necessary to remand these service-connection claims for the AOJ to arrange another VA compensation examination to obtain a medical nexus opinion regarding their nature and etiology. 

Again, the Board reiterates that the Veteran is presumed to have been exposed to herbicides, since his DD Form 214 confirms he served in the Republic of Vietnam during the Vietnam War. 38 C.F.R. § 3.307(a)(6)(iii).

As mentioned, he alternatively asserts these disabilities were causally related and/or chronically aggravated by his service-connected Type II Diabetes Mellitus. Service connection may be established on a secondary basis for disability that is proximately due to or the result of a service-connected condition. See 38 C.F.R. § 3.310(a) and (b); see also Allen v. Brown, 7 Vet. App. 439, 448 (1995) (en banc). 

The July 2009 and February 2010 VA examination and opinion reports of record for the hypertension, peripheral neuropathy of the upper extremities, ED, and renal insufficiency are inadequate in critical respects. See Barr v. Nicholson, 21 Vet. App. 303, 311 (2007) (holding that once VA undertakes the effort to provide an examination for a service-connection claim, even if not statutorily obligated to do so, it must provide an adequate one or, at a minimum, notify the claimant why one will not or cannot be provided). Inadequate medical examinations include examinations that contain only data and conclusions, do not provide an etiological opinion, are not based upon a review of medical records, or provide unsupported conclusions. Nieves- Rodriguez v. Peake, 22 Vet. App. 295, 304 (2008); Stefl v. Nicholson, 21 Vet. App. 120, 124 (2007). 

Concerning the claim for peripheral neuropathy of the upper extremities, the February 2010 VA examination suggested early signs of carpal tunnel syndrome in his hands/wrists based upon the episodic nature of his hand numbness symptoms. In that regard, the examiner suggested, "Consequently, a repeat study in one year should be performed." However, this suggested repeat study was never performed after a year's time had passed. A remand is necessary for another neurological examination, with EMG-NCV testing to confirm whether he has a current disability of carpal tunnel syndrome in hands, and if so, to ascertain its etiology.

Regarding the claim for hypertension, the Veteran asserts it was caused by or aggravated by his service-connected right knee degenerative joint disease, in that his right knee disability prevented him from exercising and maintaining his health. The July 2009 VA examination noted a medical history of initial diagnosis of hypertension in 1999 and of diabetes in 2006, and appeared to discount a secondary relationship to diabetes by diagnosing "essential hypertension." Nonetheless, the examiner's opinion was inadequate for failing to provide a clearer opinion on etiology of the hypertension, especially regarding his contention that hypertension was chronically aggravated by the service-connected right knee disability. 

Also, concerning the ED and renal insufficiency claims, the July 2009 VA examiner provided negative medical opinions against the possibility these disabilities are causally related to Type II, Diabetes Mellitus. Importantly, though, the opinion was inadequate because it did not opine on the possibility that ED and renal insufficiency were chronically aggravated by Type II, Diabetes Mellitus, not to mention commenting on direct etiology to service, including as due to presumed herbicide exposure. 

A VA examination and medical opinion is additionally warranted for the other service-connection claims for rash of the face and scalp, GERD, and a sinus disability, because the record suggests continuity of symptomatology since service. Indeed, the Veteran is competent to assert symptoms of skin rashes, acid reflux and digestive problems, and sinus difficulties, since within the realm of lay experience and observation. See Jandreau v. Nicholson, 492 F.3d 1372, 1377 (Fed. Cir. 2007); Barr v. Nicholson, 21 Vet. App. 303, 310 (2007); and 38 C.F.R. § 3.159(a)(2). 

The Board requires medical comment to resolve these claims, especially given the medical complexity of the matters. On remand, the AOJ should arrange for an appropriate VA examination and medical opinion on the nature and etiology of his claimed hypertension, peripheral neuropathy of the upper extremities, rash of the face and scalp, GERD, ED, renal insufficiency, and a sinus disability, as a result of exposure to herbicides during his active duty military; or alternatively, on a secondary basis to service-connected Type II, Diabetes Mellitus. See also McLendon v. Nicholson, 20 Vet. App. 79 (2006); Charles v. Principi, 16 Vet. App. 370, 374-75 (2002); and Waters v. Shinseki, 601 F.3d 1274 (Fed. Cir. 2010). 

TDIU Claim

The Veteran's contentions and the record raises a continuing claim for entitlement to total disability based on individual unemployability. See Rice v. Shinseki, 22 Vet. App. 447 (2009). Consequently, on remand, the Veteran should be afforded an appropriate VA examination and medical opinion addressing whether the Veteran's service-connected disabilities, separately or in combination, impact his ability to secure or follow substantially gainful employment. 

VA Treatment Records

The claims file reflects that the Veteran has receives VA medical treatment through the VA Medical Center (VAMC) in Memphis, Tennessee. However, as the claims file only includes treatment records from that provider dated up to April 201, any additional records from that facility should be obtained. The Board emphasizes that records generated by VA facilities that may have an impact on the adjudication of a claim are considered constructively in the possession of VA adjudicators during the consideration of a claim, regardless of whether those records are physically on file. Dunn v. West, 11 Vet. App. 462, 466-67 (1998); Bell v. Derwinski, 2 Vet. App. 611, 613 (1992). The AMC should obtain and associate with the claims file all outstanding VA records.

Accordingly, the case is REMANDED for the following action:

1. Obtain the Veteran's VA treatment records from the Memphis VAMC, or any other identified VA facility, for the period from April 2010 to the present.

2. Schedule the Veteran for a VA examination with a physician with appropriate expertise in order to determine the nature and etiology of his hypertension, peripheral neuropathy of the upper extremities, rash of the face and scalp, GERD, ED, renal insufficiency, and a sinus disability. It is imperative that the claims file be made available to the examiner and reviewed in connection with the examination. Any medically indicated special tests should be accomplished, and all special tests and clinical findings should be clearly reported. The examiner should respond to the following:

a) Please identify all disabilities related with his claimed hypertension, peripheral neuropathy of the upper extremities, rash of the face and scalp, GERD, ED, renal insufficiency, and a sinus disability. Concerning the claim for peripheral neuropathy of the upper extremities, perform neurological examination with EMG-NCV testing, to confirm if the Veteran currently has a diagnosis of carpal tunnel syndrome as opposed to peripheral neuropathy. 

b.) For each disability found, did it at least as likely as not (a 50% or higher degree of probability) have its clinical onset during the Veteran's period of service, or is any such disability otherwise related to such period of service, including to any herbicide exposure?

For the purposes of this opinion, the examiner should presume that the Board has had herbicide exposure during service in the Vietnam War, in the Republic of Vietnam.

For purposes of the examination and opinion, the examiner must consider that the Veteran has asserted post-service continuity of symptoms (e.g., numbness, skin rashes, acid reflux, impotence, sinus difficulties, etc.).

c.) For each disability found, was it at least as likely as not (a 50% or higher degree of probability) caused by the service-connected diabetes mellitus and/or right knee disability?

d.) For each disability found, was it is at least like as not (a 50% or higher degree of probability) aggravated (worsened) by the Veteran's service connected diabetes mellitus and/or right knee disability?

The term "aggravated" in the above context refers to a permanent worsening of the underlying condition, as contrasted to temporary or intermittent flare-ups of symptomatology which resolve with return to the baseline level of disability.

If aggravation is present, the examiner should indicate, to the extent possible, the approximate level of severity of the claimed disability (i.e., a baseline) before the onset of the aggravation.

All opinions and conclusions expressed must be supported by a complete rationale in a report. The examiner should reconcile any opinions with the service treatment records, post-service treatment records, and lay statements and testimony of the Veteran.

3. The Veteran should be afforded a VA examination with opinion to determine whether he is unemployable solely due to his service-connected disabilities, either when considered separately or in combination.

Any and all studies, tests, and evaluations deemed necessary by the examiner should be performed. 
The examiner should be requested to review all pertinent records associated with the claims file and to comment on the effect of the Veteran's service-connected disabilities on his ability to engage in any type of full-time employment and whether, in the examiner's opinion, the service-connected disabilities alone are of such severity to result in unemployability. 

The examiner should be specifically asked whether the Veteran's right knee disability results in a marked interference with employment, to include causing him to be unemployable.

A clear rationale for all opinions would be helpful and a discussion of the facts and medical principles involved would be of considerable assistance to the Board. Since it is important 'that each disability be viewed in relation to its history[,]' 38 C.F.R. § 4.1, copies of all pertinent records in the Veteran's claims file, or in the alternative, the claims file, must be made available to the examiner for review.

The examiner should explain the rationale for any opinion given regarding the effect of the Veteran's service-connected conditions on his ability to obtain or maintain employment, to include discussion of obstacles and challenges he might face, and his capability for employment in light of his past employment experience. The examiner should note that consideration may be given to the Veteran's level of education, special training, and previous work experience in arriving at a conclusion, but not to his age or to the impairment caused by nonservice-connected disabilities. The question is whether the Veteran is capable of performing the physical and mental acts required by employment, not whether the Veteran can find employment.

4. Ensure that the requested actions have been accomplished (to the extent possible) in compliance with this REMAND. If any action is not undertaken, or is taken in a deficient manner, appropriate corrective action should be undertaken. 

4. Upon completion of the above, the AOJ should readjudicate the remaining claims and adjudicate the Veteran's claim of entitlement to a TDIU, with consideration of all applicable laws and regulations. If any benefit sought on appeal remains denied, the Veteran and his representative should be furnished an appropriate supplemental statement of the case and be provided an opportunity to respond. Thereafter, the case should be returned to the Board for further appellate consideration.

The appellant has the right to submit additional evidence and argument on the matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

These claims must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West Supp. 2011).


______________________________________________
MICHAEL A. HERMAN
Veterans Law Judge, Board of Veterans' Appeals

Department of Veterans Affairs